UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| HALO ELECTRONICS, INC., <br><br>              Plaintiff, <br><br> v. <br><br> PULSE ELECTRONICS, INC. and <br> PULSE ELECTRONICS <br> CORPORATION, <br><br>              Defendants. | 2:07-cv-00331-PMP-PAL <br><br> **ORDER** |

Before the Court is Defendants Pulse Electronics, Inc. and Pulse Electronics Corporation's (collectively "Pulse") Motion in Limine to Preclude Certain of Plaintiff's Expert Opinions (Doc. #338), filed June 22, 2012. Plaintiff Halo Electronics, Inc. ("Halo") filed an Opposition (Doc. #366) on July 6, 2012. The Court held a hearing on this motion and other pretrial matters on October 1, 2012. For the reasons set forth below, the Court denies Pulse's motion in its entirety.

**I. SUMMARY OF THE ARGUMENTS**

Pulse seeks to exclude certain opinions of Halo's damages expert, John Hansen ("Hansen"), as irrelevant and unreliable expert testimony under Federal Rule of Evidence 702. First, Pulse contends its sales of the accused products outside of the United States

("U.S.") are irrelevant.  Pulse further argues Hansen's royalty base analysis is unsupported by proper evidence and should be excluded.  Pulse also claims Hansen used a method the Federal Circuit has rejected as unreliable to calculate the royalty rate.  Pulse additionally challenges Hansen's reliance on a patent licensing agreement to which Pulse is not a party in determining the royalty rate.  Pulse further argues Hansen should be precluded from asserting the damages period began in 2002.  Finally, Pulse contends its total worldwide sales figures for the accused products should be excluded as irrelevant.

Halo responds that Hansen's opinions are based on relevant and reliable evidence and methodology and should not be excluded.  Halo first argues Pulse's sales of the accused products outside of the U.S. are relevant for Halo's induced infringement claim.  Additionally, Halo submits Hansen properly relied on the only evidence available for his royalty base analysis.  Halo further contends Hansen applied a method the Federal Circuit has condoned to determine a reasonable royalty rate.  Halo also argues the license to which Pulse is not a party is relevant to the royalty rate analysis.  Halo further asserts that when the damages period began is a question of fact for the jury to decide.  Finally, Halo argues Pulse's total worldwide sales revenue on the accused products is relevant for both damages and non-damages purposes.

**II.  DISCUSSION**

Federal Rule of Evidence 702 permits testimony based on "scientific, technical, or other specialized knowledge" by experts qualified by "knowledge, skill, experience, training, or education" if the testimony is both relevant and reliable.  See also Fed. R. Evid. 402.  The trial court acts as a "gatekeeper" to exclude expert testimony that is not both relevant and reliable.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999).

Testimony is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (stating testimony is relevant if it

"logically advances a material aspect of the proposing party's case").  To be helpful to the jury, the testimony must be "'tied to the facts'" of the particular case.  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 591 (1993) (quoting <u>United States v. Downing</u>, 753 F.2d 1224, 1242 (3d Cir. 1985)).

Expert testimony is reliable if it is "based upon sufficient facts or data," "the product of reliable principles and methods," and the expert "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Reliability, however, is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology."  <u>Stilwell v. Smith & Nephew, Inc.</u>, 482 F.3d 1187, 1192 (9th Cir. 2007) (quotation omitted).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  <u>Primiano v. Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010).

Whether to admit expert testimony, as well as deciding how to determine whether the testimony is reliable, lies within the trial court's discretion.  <u>Kumho Tire Co.</u>, 526 U.S. at 152; <u>United States v. Calderon-Segura</u>, 512 F.3d 1104, 1109 (9th Cir. 2008).  The party offering the expert testimony bears the burden of establishing its admissibility.  <u>Lust by and through Lust v. Merrell Dow Pharm., Inc.</u>, 89 F.3d 594, 598 (9th Cir. 1996).

### A. Hansen's 30% Royalty Base Determination

#### 1. Relevance

Pulse first argues its sales of the accused products outside of the U.S. are irrelevant because the Court previously found Pulse is not liable for direct infringement for these sales.  Accordingly, Pulse submits the royalty base should be limited to 13-14% of Pulse's worldwide sales of the accused products, which is the amount Pulse sells directly in the U.S.  Halo responds that the amount of Pulse's accused products imported back into the U.S. by third parties is relevant for Halo's viable claim of induced infringement.  Halo therefore argues the royalty base should not be limited to Pulse's U.S. sales.

3

The Court previously found a genuine issue of material fact regarding whether Pulse is liable for induced infringement. (Order (Doc. #300) at 48-49.)  Therefore, the amount of non-U.S. sales of Pulse's accused products that were imported back into the U.S. by third parties is relevant to Halo's induced infringement claim and the royalty base analysis.

**2. Reliability**

Pulse asserts Hansen's 30% royalty base determination is based on insufficient evidence and therefore unreliable.  Pulse argues Hansen improperly, and only, relied on statements by Halo's Vice President estimating the amount of Pulse's accused products that came back into the U.S., general investment disclosures from third parties, and a licensing agreement between Halo and a third party.  Halo responds that Pulse and its customers did not have the statistics to show the amount of accused products Pulse initially sold outside the U.S. that eventually were imported back into the country.  Therefore, Halo concludes Hansen was required to use other evidence to estimate the amount.  Halo also argues Hansen reasonably considered the licensing agreement between Halo and its competitor estimating the imports of the competitors' licensed products and the statements of Halo's Vice President estimating the same for Pulse, as reasonable beliefs of the industry.

Hansen reasonably relied on the available evidence to approximate the amount of Pulse's accused products that are sold directly to and imported into the U.S.  Pulse and a company to which Pulse's customers sold admitted that, in addition to the accused products Pulse sold directly into the U.S., some of the accused products sold outside of the U.S. are incorporated into end-products and then imported back into the U.S. (Decl. of Craig C. Countryman (Docs. #372-75), Ex. 18 at 15-19, Ex. 20 at 352-53.)  However, neither Pulse nor the other company could provide information regarding how many of the end-products containing Pulse's accused products are imported back into the U.S.  (Id., Ex. 18 at 15-19, Ex. 20 at 349-50, 352.)

4

Based on the lack of direct statistics, Hansen relied on other evidence to approximate how many of Pulse's accused products were indirectly imported into the U.S. (Defs.' Daubert Mot./Mot. in Limine No. 1 to Preclude Certain of Pl.'s Expert Ops. (Doc. #338), Ex. 2 ["Hansen Report"] at 4, 39.) Hansen first identified the type of end-products the accused products are incorporated into, such as servers, desktops, notebook computers, switches, and routers. (Hansen Report at 40.) Then, based on the worldwide sales figures for these end-products, Hansen determined the percentage of sales into the U.S. of these end-products. (Id.) Hansen further determined that Pulse sold the accused products to customers outside of the U.S., and those customers sold to companies that sell these end-products in the U.S. (Id.)

Next, Hansen looked at the percentage of U.S. sales for the companies to which Pulse's customers sold, based on those companies' total worldwide sales figures. (Id.) Hansen specifically considered customers to which Pulse sold a high percentage of the accused products, and those customers sold to a company that made a majority of its sales in the U.S. (Id.) Therefore, based on the percentage of end-products that are sold into the U.S. and the percentage of U.S. sales of the companies to which Pulse's customers sold to, Hansen found it was reasonable to assume that at least 30% of Pulse's accused products are incorporated into products that ultimately are shipped into the U.S. (Id. at 41.) Neither the estimation given by Halo's Vice President nor the licensing agreement between Halo and a third party are incorporated into the royalty base analysis section of Hansen's report. Rather, they are referenced in a footnote as evidence that supported a higher rate, rendering the 30% base more reasonable in Hansen's opinion. (Hansen Report at 41 n.182.)

The statistical evidence Hansen uses to estimate his proposed royalty base is more reliable than that in PACT XPP Techs, AG v. Xilinx, Inc., No. 07-cv-00563 (E.D. Tex. Apr. 16, 2012). In PACT, the court rejected the expert's assumption that 3% of the defendant's accused products were sold to the government because the defendant's

1 customers sold 3% of the customer's total products to the government. Id. at 6-7. The
2 court noted there was "no evidence supporting the assumption that the percentage of each
3 customer's sales to the government is representative of the percentage of that customer's
4 [products purchased from the defendant] that are sold to the government." Id. at 6. Here,
5 however, Hansen narrowed his inquiry to the end-products that could contain the accused
6 products, as well as companies that bought from Pulse's customers and sold those end-
7 products in the U.S. (Hansen Report at 40.) This resulted in an estimation tailored to the
8 potential amount of Pulse's accused products imported back into the U.S.

9    Hansen based his royalty base analysis on sufficient facts considering the
10 evidence available in this case. An estimation was necessary given the lack of specific data
11 showing how much of Pulse's sales of the accused products outside the U.S. were
12 eventually imported back into the U.S. See Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d
13 1301, 1336 (Fed. Cir. 2009) (noting the reasonable royalty analysis "necessarily involves an
14 element of approximation and uncertainty.") (quotation omitted). The proper avenue for
15 Pulse to challenge the evidence Hansen relied on and the conclusions drawn from that
16 evidence is on cross examination or otherwise at trial, not the exclusion of Hansen's royalty
17 base opinion altogether. Therefore, Hansen's opinion regarding the 30% royalty base is
18 admissible.

### B. Hansen's 10-15% Royalty Rate Determination

20    Pulse next argues Hansen improperly arrived at a 10-15% royalty rate by dividing
21 the profit margins of Halo and Pulse in half and using the resulting figures as the upper and
22 lower limits for the rate. Pulse contends this is a "supercharged" 50% version of the "25%
23 rule of thumb" rule rejected by the Federal Circuit in Uniloc USA, Inc. v. Microsoft Corp.,
24 632 F.3d 1292 (Fed. Cir. 2011). Halo counters that Hansen did not rely on a "rule of
25 thumb" concept, and properly relied on the 15 factors in Georgia-Pacific Corp. v. U.S.
26 Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970) to determine his proposed royalty rate.

The 25% rule of thumb rule posits that in a hypothetical negotiation between the parties, 25% of the profit would go with the patent owner and the rest would stay with the infringer. Uniloc, 632 F.3d at 1311. The expert in Uniloc started with this 25% figure, and then considered the Georgia-Pacific factors to determine whether that rate should be adjusted. Uniloc, 632 F.3d at 1311. The Federal Circuit found the 25% rule of thumb assumption a "fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation." Id. at 1315. Therefore, the expert's opinion was inadmissible under Daubert and the Federal Rules of Evidence for "fail[ing] to tie a reasonable royalty base to the facts of the case at issue." Uniloc, 632 F.3d at 1315, 1318.

Halo has shown Hansen did not apply a "50% rule of thumb" assumption in his royalty rate analysis. Hansen analyzed each of the 15 Georgia-Pacific factors to predict the results of a hypothetical negotiation between the parties and to propose a reasonable royalty rate. (Hansen Report at 8-36.) The Federal Circuit approves using the Georgia-Pacific factors as a reliable way to frame the reasonable royalty inquiry. Uniloc, 632 F.3d at 1317. Hansen tied the specific facts of this case to his proposed royalty rate by using this approved methodology. Because Halo has demonstrated Hansen used the Georgia-Pacific factors to determine his reasonable royalty rate range of 10-15%, rather than a version of the unreliable 25% rule, the Court will not exclude Hansen's royalty rate analysis.

### C. Hansen's Reliance on a License Between Third Parties

Pulse also argues Hansen improperly relied on a patent use license to which Pulse was not a party under Georgia-Pacific factor 2 in the royalty rate analysis. Pulse argues it obtained a controlling interest in the licensee company well after the license was negotiated and entered into, therefore the license does not indicate what Pulse would have agreed to had it negotiated the license. Halo responds that Hansen's reliance on the license is relevant under factor 2 because this factor addresses rates the licensee has paid on comparable patents, not just agreements the licensee negotiated. Halo contends Pulse acquired a

7

controlling interest in the licensee company, made the licensee company's payments under the license for a period of time, and then negotiated with the licensor company to settle for missed payments and reach a new agreement. Halo further argues even if Hansen's reliance on the license under factor 2 was improper, the license is relevant under factor 12 as an example of a licensing agreement on comparable patents.

Hansen's reliance on the license for his analysis of factor 2 is factually supported. Factor 2 looks at "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." Georgia-Pacific, 318 F. Supp. at 1120. Hansen considered the license under factor 2 because the licensee company was Pulse's affiliate. (Hansen Report at 13.) Hansen also noted Pulse paid royalties pursuant to the licensing agreement and renegotiated the licensing arrangement. (Id. at 13, 14 n.55.) Thus, the license is relevant to factor 2 to show the rates Pulse has paid to use comparable patents.

The license is also relevant under factor 12. Factor 12 considers "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." Georgia-Pacific, 318 F. Supp. at 1120. Hansen noted the license under factor 12 as an indicator of the royalty rates that may be appropriate here. (Hansen Report at 32.) Additionally, in his summary and conclusion, Hansen considered factors 1, 2, and 12 together as addressing "licensing history and comparable license agreements, as well as royalty rates within the industry," finding the license placed upward pressure on the royalty rate. (Hansen Report at 33-34.) Pulse does not argue the license is inappropriate under factor 12. Therefore, the license is relevant to the royalty rate analysis under factors 2 and 12 and is admissible.

**D. The Damages Period**

Pulse next argues Hansen should be prohibited from testifying that the damages period began in 2002. Pulse argues that the Court previously held letters sent by Halo to

Pulse in 2002 informed Pulse only of the possibility it was infringing and implied that Halo had yet to thoroughly investigate, citing the Court's summary judgment Order (Doc. #300) at page 38 for support. According to Pulse, the 2002 letters therefore did not provide legally adequate notice to begin the damages period under 38 U.S.C. § 287 as a matter of law. Pulse thus concludes that Hansen should be required to opine the damages period began in 2003. Halo responds that Pulse already moved for summary judgment for lack of actual notice based on these 2002 letters, which the Court denied. Halo claims Pulse's motion in limine is really an untimely motion for summary judgment based on inadequate notice. Finally, Halo argues whether the 2002 letters gave Pulse adequate legal notice of infringement is an issue of fact for the jury to decide.

   Pulse previously moved for summary judgment on the theory of equitable estoppel. (Defs.' Mot. Summ. J. on Equitable Estoppel & Partial Summ. J. on Laches & Failure to Give Notice Under 38 U.S.C. § 287(a) (Doc. #249) at 8-11.) In that motion, Pulse argued Halo should be estopped from bringing this infringement action because its 2002 letters followed by Halo's inaction misled Pulse into believing Halo would not be enforcing its patents. (Id. at 8-9.) In its summary judgment Order, the Court ruled that Halo raised genuine issues of material fact about whether Halo should be estopped. (Order (Doc. #300) at 38.) In the context of the equitable estoppel analysis, the Court concluded a "reasonable jury could find that the letters do not rise to the level of threatening vigorous enforcement then delaying bringing an action." (Id.) The Court did not hold that Halo failed to give adequate notice under § 287 as a matter of law. To the extent Pulse's motion in limine is an attempt to move for summary judgment on the issue of the adequacy of notice, it is untimely and the Court will not consider it. Therefore, the Court will not preclude Hansen from opining the damages period began in 2002 at this time.

///

///

9

### E.  Reference to Pulse's Total Worldwide Sales of the Accused Products

Finally, Pulse contends that Hansen and Halo should be precluded from referring to Pulse's total worldwideسales of the accused products.  Pulse argues even if Hansen's 30% royalty base is admitted, only the sales figures for the accused products that ultimately ended up in the U.S. are relevant.  Halo argues the worldwide sales figures are relevant to calculate damages for induced infringement, for 2 factors in the royalty rate analysis, and for other non-damages issues.

Halo has shown Pulse's total worldwide sales figures for the accused products are relevant.  To calculate Halo's infringement damages, Hansen applied his royalty base to Pulse's total worldwide sales figures, and then he applied his reasonable royalty rate to the resulting figure.  (Hansen Report at 41-42.)  Therefore, the worldwide sales figures are relevant to the damages analysis.  Pulse's worldwide sales figures are likewise relevant to the royalty rate analysis.  Factor 6 considers whether the patented technology promotes the sale of other products, for either the patentee or licensee.  Georgia-Pacific, 318 F. Supp. at 1120.  Therefore, the extent of Pulse's worldwide sales of the accused products is relevant to determining its effect on the sale of Pulse's other products internationally.  (Hansen Report at 20-21.)  Factor 8 considers, among other things, the commercial success of the product, and the worldwide sales figures are relevant to that determination as well.  (Hansen Report at 22); Georgia-Pacific, 318 F. Supp. at 1120.

Finally, Pulse's worldwide sales figures may be relevant to non-damages issues.  Specifically, Halo has shown the worldwide sales figures are probative of the patented products' commercial success, a factor relevant to analyzing the obviousness of the patented products.  See Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1380 (Fed. Cir. 2012) (finding the patentee's worldwide sales of the patented products relevant to the commercial success analysis); Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1579 (Fed. Cir. 1997) (finding the accused infringer's sales relevant to the

10

commercial success analysis). Therefore, the Court will not exclude reference to Pulse's worldwide sales figures for the accused products.

**III. CONCLUSION**

**IT IS THEREFORE ORDERED** that Defendants Pulse Electronics, Inc., and Pulse Electronics Corporation's Daubert Motion/Motion in Limine No. 1 to Preclude Certain of Plaintiff's Expert Opinions (Doc. #338) is hereby **DENIED**.

DATED: October 25, 2012

_____
PHILIP M. PRO
United States District Judge