1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | | |
|---|---|---|
| HALO ELECTRONICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 2:07-cv-00331-PMP-PAL |
| | ) | |
| v. | ) | |
| | ) | **ORDER** |
| PULSE ELECTRONICS, INC. and | ) | |
| PULSE ELECTRONICS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before the Court is Halo Electronics, Inc.'s ("Halo") Motion for a Permanent Injunction (Doc. #505), filed December 21, 2012. Pulse Electronics, Inc. and Pulse Electronics Corporation (collectively "Pulse") filed a Response (Doc. #515) on January 18, 2013. Halo filed a Reply (Doc. #516) on January 25, 2013.

The parties are familiar with the facts and proceedings in this matter, and therefore the Court will repeat them here only when necessary. Halo contends it is entitled to a permanent injunction because it has suffered, and continues to suffer, irreparable harm that will continue absent an injunction. Halo also argues that damages are inadequate to compensate Halo because the ongoing harm to Halo is difficult to quantify and cannot be fully cured by an award of future damages. Halo further contends that the balance of the hardships weighs in Halo's favor because Halo will suffer irreparable harm not compensable by damages, but Pulse will only be required to stop infringing. Halo further contends an injunction would not disserve the public interest because it would protect

patent rights and Halo and its licensees provide alternative sources of the patented product. Halo also argues its injunctive relief should include both the standard prohibitions on direct and induced infringement, as well as special provisions to prevent further induced infringement by Pulse.

Pulse responds that Halo's evidence does not prove it has suffered irreparable harm, that Halo's litigation actions and licenses show it is not irreparably harmed, and that in any event, Halo cannot demonstrate a nexus between Pulse's infringement and any harm. Pulse further contends that monetary damages are adequate to compensate Halo because Halo licenses its patented design, and thus can place a monetary amount on future infringement. Pulse also argues the balance of the hardships weighs against an injunction because allowing Pulse to make royalty payments and continue selling the infringing products would impose no hardship for Halo, but granting Halo's requested injunctive relief would significantly hinder Pulse's ability to make non-infringing sales outside the United States. Pulse further contends the public interest would not be served by an injunction because the disruption in Pulse's business would adversely affect Pulse's customers, its customers' customers, and consumers. Finally, Pulse contends that if the Court grants an injunction, Halo's proposed injunction is overly broad and the injunction should relate only to Pulse's proven United States sales of the infringing products.

**I. ANALYSIS**

In patent infringement cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. A patentee who has proven infringement and is seeking a permanent injunction must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public

interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). "Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement." Edwards Lifesciences AG v. CoreValve, Inc., 699 F.3d 1305, 1314 (Fed. Cir. 2012). Ultimately, however, "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." eBay Inc., 547 U.S. at 391.

**A.  Irreparable Harm**

Halo contends that it has suffered and will continue to suffer irreparable harm due to Pulse's infringement. Halo argues that Pulse is a direct, large competitor of Halo's, and Halo has suffered and will continue to suffer irreparable harm resulting from lost sales, price erosion, and lost customer goodwill.

Pulse responds that Halo's evidence does not demonstrate irreparable harm. Pulse also argues Halo cannot demonstrate a nexus between Pulse's infringement and Halo's alleged irreparable harm. Pulse further asserts that Halo's willingness to license its patented design to other competitors shows it is not irreparably harmed by infringement of its patents. Pulse finally argues that Halo's claim of irreparable injury is negated by Halo's delay in bringing suit, failure to seek a preliminary injunction, and agreement to stay the case for almost two years.

Halo has provided evidence that it directly competes with Pulse and has lost sales and customer goodwill, which is evidence of irreparable harm. Halo also has shown a nexus between this irreparable harm and Pulse's infringement. Furthermore, that Halo licenses its patented technology to competitors does not negate its showing of irreparable harm as to Pulse, because Pulse poses a larger threat of harm than Halo's licensees. Halo's delay in bringing suit also does not show it was not irreparably harmed because the delay was largely out of Halo's control. Finally, although Halo's failure to seek a preliminary

injunction and delay in lifting the stay provide evidence that Pulse's infringement does not irreparably harm Halo, considering all of the evidence the balance weighs in favor of finding irreparable harm.

### 1. Halo's Evidence of Irreparable Harm

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012). Direct competition between the patentee and the infringer is evidence the patentee is irreparably harmed by the infringing activities. Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1152-54 (Fed. Cir. 2011). "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." Douglas Dynamics, LLC v. Buyers Prods. Co., --- F.3d ----, 2013 WL 2158423 at *6 (Fed. Cir. May 21, 2013); see also Merial Ltd. v. Cipla Ltd., 681 F.3d 1283, 1306 (Fed. Cir. 2012) (finding irreparable harm when the patentee and infringer were competitors and the infringing product was introduced as a cheaper but otherwise equal alternative to the patentee's products, which would result in lost market share and price erosion). Loss of sales, loss of customer goodwill, and price erosion also "are all valid grounds for finding irreparable harm." Celsis, 664 F.3d at 930.

Halo and Pulse are direct competitors in the surface mount transformer market. Two of Halo's witnesses testified that Pulse was one of Halo's major competitors for surface mount transformers. (Jury Trial Tr. - Day 4 (Doc. #442) at 280; Jury Trial Tr. - Day 5 (Doc. #464) at 100, 133-37.) One of Pulse's witnesses testified that Pulse considered Halo a competitor in the "discretes" market, which included surface mount transformers. (Jury Trial Tr. - Day 6 (Doc. #465) at 68-69, 72-73.) Furthermore, Pulse's internal documents and website identify Halo as a competitor for discrete products. (Pl.'s Trial Ex. 319 at 42; Decl. of Craig E. Countryman in Support of Halo's Mot. for Permanent Inj. ["Countryman

4

Decl."] (Doc. #506), Ex. A-C.)  Halo sells its patented products to companies to which Pulse directly markets and to which Pulse's customers sell Pulse's infringing products. (Jury Trial Tr. - Day 2 (Doc. #435) at 13-14; Jury Trial Tr. - Day 4 (Doc. #442) at 277-78; Jury Trial Tr. - Day 5 (Doc. #464) at 29-34; Pl.'s Trial Ex. 282 at 18; Decl. of Jeffrey R. Heaton in Support of Halo's Mot. for Permanent Inj. ["Heaton Decl."] (Doc. #507) at ¶ 2; Decl. of Carrie Munson in Support of Def.'s Opp'n to Pl.'s Mot. for Permanent Inj. ["Munson Decl."] (Doc. #515-1) at ¶ 8.)  Thus, Halo and Pulse directly compete in the surface mount transformer market.  See Robert Bosch, 659 F.3d at 1153 ("Although the parties dispute the finer details of the nature and extent of their competition, we agree with [the patentee] that the undisputed facts show that it competes with [the infringer] in all of the market segments identified by the parties.").

Given that Halo and Pulse are direct competitors, Halo has lost sales because of Pulse's infringement.  Halo demonstrated that it has lost business to Cisco, a large company that sells products which incorporate surface mount transformers.  Cisco requires that the transformers incorporated into its product be from one of four approved suppliers: Halo, Pulse, and two other companies to which Halo has granted licenses.  (Jury Trial Tr. - Day 4 (Doc. #442) at 282-83; Dep. of Hugh Kennedy (Doc. #494) at 33-34.)  Each quarter, Cisco divides its transformer requirements between the approved suppliers, giving each one a percentage of Cisco's overall surface mount transformer requirement.  (Jury Trial Tr. - Day 4 (Doc. #442) at 146-47, 194-95, 285.)  Thus, it is more likely than not that Halo lost sales to Cisco because of Pulse's infringing product sales to Cisco, even given the alternative approved suppliers to which Cisco could have given its business.  Cf. Robert Bosch, 659 F.3d at 1154 ("While it is true that at least some of [the patentee's] loss of market share is attributable to other competitors, it is undisputed that it was [the infringer] that secured the Wal-Mart account, which alone accounts for a substantial portion of the entire market.").  Additionally, one of Halo's Vice Presidents stated that in another instance Pulse reduced its

prices on infringing products by 40 percent, which Halo was unable to match, and therefore Halo lost sales to another customer, Siemens.  (Heaton Decl. at ¶ 3.)  Therefore, Halo has shown it has lost sales because of Pulse's infringement.

Halo also has shown it has suffered a loss in customer goodwill.  One of Halo's Vice Presidents testified that Halo's patented technology was very important to Halo's business because the technology showed customers that Halo was a technology leader and allowed Halo to distinguish itself over larger competitors.  (Jury Trial Tr. - Day 2 (Doc. #435) at 13, 82.)  He also testified that Halo promoted its products by emphasizing its patented technology.  (Id. at 82-92; see also Pl.'s Trial Exs. 97 & 100.)  However, another of Halo's Vice Presidents testified that, in the beginning, the open construction design of the Halo's patents was seen as unique, but it is more commonplace now because Halo's competitors have also started using the design.  (Jury Trial Tr. - Day 4 (Doc. #442) at 292.)  Pulse is one of Halo's largest competitors and began selling products that embody Halo's patented design after Halo patented its design.  (Jury Trial Tr. - Day 5 (Doc. #464) at 100, 133-37; Jury Trial - Day 8 (Doc. #467) at 233-34; Jury Verdict (Doc. #482).)  Therefore, Halo has demonstrated that Pulse's infringement has contributed to a decrease in customer goodwill towards Halo because Halo's patented design, which used to distinguish Halo, is now seen as more common.[1]  See Douglas, 2013 WL 2158423 at *6 ("Douglas's reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' snowplows, particularly products considered less prestigious and innovative.").

---

[1]  Pulse argues that Halo was complicit in its loss of customer goodwill because Halo has granted licenses to some of its competitors, and does not require those licensees to identify their products as using Halo technology.  However, Halo issued press releases announcing that it had licensed its patented technology to competitors.  (Supp. Decl. of Craig E. Countryman in Support of Halo's Mot. for Permanent Inj. (Doc. #516-1), Ex. 2.)  Halo informing the public that the technology was Halo's and these competitors were Halo's licensees shows Halo was concerned with informing the public that this technology was Halo's and Halo was not complicit in any loss of goodwill.

As to price erosion, Halo offers evidence that Pulse "has sold its products at lower average selling prices than Halo." (Decl. of John L. Hansen in Support of Halo's Mot. for Permanent Inj. ["Hansen Decl."] (Doc. #508) at ¶ 12.) Specifically, Halo provides evidence of Halo's and Pulse's prices, number of sales, and profits on three different sets of competing parts, which shows Pulse's prices are generally lower and Pulse sells more of these particular products. (Id. at ¶ 12 & Schedule 1 (for example, showing that in 2009 Pulse sold two infringing parts for $0.63 and $0.67, while Halo sold competing parts for $1.28 and $1.13, respectively).) Halo's damages expert stated that, based on this disparity in pricing, "[h]ad Pulse not been in the market selling the infringing [parts], it is more likely than not that Halo would have sold its product at a higher price." (Id. at ¶ 12.) Additionally, Halo presented evidence that when Halo dropped the price of one of its products below that of Pulse's competing infringing part, Halo sold more of and made more profit on that part than Pulse did on its competing infringing part. (Id. at Schedule 1.) Halo's damages expert concluded that when Halo "suffers price erosion as a result of a competitor offering competing products at a lower price, it could be difficult for Halo to raise prices again later." (Id. at ¶ 12.)

However, Pulse asserts that price erosion is not due to Pulse's price undercutting, but rather due to Chinese and Taiwanese companies selling low-cost "knock-offs." (Munson Decl. at ¶ 6; Decl. of Richard M. Holstrum (Doc. #515-2) at ¶ 8-9.) Pulse further asserts that it "is not known in the industry as a price leader," and that Pulse's profit margin is due to several factors other than price, such as Pulse's reputation as a technology leader and for providing high quality solutions, high-volume manufacturing capacity, and the fact that Pulse is on the approved vendor list of the preferred supplier for many companies. (Id. at ¶ 3-5.) Due to Pulse's evidence of other reasons for price erosion in the surface mount transformer market, price erosion does not weigh in favor of irreparable harm. Compare with Robert Bosch, 659 F.3d at 1154 (finding unrebutted testimony about price erosion

from the patentee's director of product management was sufficient, even though noting the patentee could have developed more clearly the effects of the infringer's conduct as opposed to that of other competitors).  Nevertheless, Halo has shown Pulse is its direct competitor and Halo has lost sales and customer goodwill because of Pulse's infringement.

### 2.  Nexus Between Infringement and Harm

The patentee must show a causal nexus between the infringement and the harm.  Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1324 (Fed. Cir. 2012).  "[I]rreparable harm cannot be shown if sales would be lost regardless of the infringing conduct," such as if the patented feature does not drive the demand for the product.  Id. (finding, at the preliminary injunction stage, no nexus because "while there was evidence that [the patented design] had some effect on smartphone sales, there was considerable countervailing evidence indicating that it was not a determinative factor in consumer decisionmaking").

Halo has proven a nexus between its harm and Pulse's infringement.  Halo presented evidence at trial that Halo's patented design was successful because it solved the problem of enclosed surface mount transformers cracking under the high heat needed to solder the part.  (Jury Trial Tr. - Day 9 (Doc. #468), at 256-57.) Pulse stated in a letter to its customers in 2006 that it changed its products from molded construction to open construction to meet the higher soldering requirements.  (Pl.'s Trial Ex. 253; Jury Trial Tr. - Day 5 (Doc. #464) at 147-48.)  Pulse also stated in strategy documents in 2009 that it planned to completely change over its surface mount transformers to open header style products.  (Pl.'s Trial Ex. 235; Jury Trial Tr. - Day 5 (Doc. #464) at 148-49.)  An email from Pulse's marketing employee also indicated that Pulse was trying to design all new discretes, which includes surface mount transformers, using an open header package, and listed three infringing products as examples.  (Pl.'s Trial Ex. 260; Jury Trial Tr. - Day 5 (Doc. #464) at 149-50.) This supports the inference that the customers preferred and purchased Halo's open header design because it solved the problem with high heat soldering.

Pulse's Director of Marketing testified there were instances where customers preferred open header or transfer molded, but the majority of customers had no preference and made a decision based on cost.  (Jury Trial Tr. - Day 7 (Doc. #466) at 318-20.)  However, Halo has presented sufficient evidence to show that customers purchase the infringing products because they can survive the high heat soldering better than transfer molded parts, and thus Halo has shown a nexus between Pulse's infringement and Halo's irreparable harm.

### 3.  Halo's Prior Licensing to Competitors

Prior instances of the patentee granting licenses to other competitors to use its patented design is a factor that may be taken into account in the irreparable harm analysis.  eBay, 547 U.S. at 393; Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1328 (Fed. Cir. 2008).  However, there is no categorical bar against granting permanent injunctive relief when the patentee licenses its patents to others.  eBay, 547 U.S. at 393; Acumed, 551 F.3d at 1328 ("A plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed.").  Thus, a patentee may be able to show irreparable harm even if it licenses its patents.  eBay, 547 U.S. at 393.

That Halo licenses the use of its patented technology to competitors does not negate a finding of irreparable harm.  Halo's licensees are Wurth Midcom, E&E, Bel Fuse, and XFMRS, all of which are Halo's competitors.  (Jury Trial Tr. - Day 5 (Doc. #464) at 93-94.)  Bel Fuse and E&E also are the other two companies, in addition to Halo and Pulse, that are approved transformer suppliers for Cisco.  (Dep. of Hugh Kennedy (Doc. #494) at 33-34.)  Thus, Halo competes directly with two of its licensees for the same client.

However, Halo has presented evidence that Pulse is one of Halo's largest competitors, Pulse is larger than Halo and its licensees, and that it is "likely that Pulse's infringement imposes greater harm on Halo" than its current licensees.  (Hansen Decl. ¶ 13; Jury Trial Tr. - Day 5 (Doc. #464) at 99-100, 137; Jury Trial Tr. - Day 9 (Doc. #468) at 68.)  Furthermore,

Halo's licenses contain additional non-monetary terms, such as agreements not to make public statements about the validity or enforceability of the Halo patents, which, in the absence of an injunction, Pulse would not have to agree to even if ordered to pay a reasonable royalty fee.  (Pl.'s Trial Exs. 124 § 8.1, 134 § 8.2, 160 § 8.2, 161 § 4.1.)  Therefore, while Halo's licenses provide evidence that in certain situations and with certain competitors Halo may be willing to accept a license, Pulse poses a larger threat for which a royalty fee might not fully compensate Halo for Pulse's infringement.  See Acumed, 551 F.3d at 1329 ("Adding a new competitor to the market may create an irreparable harm that the prior licenses did not.").

### 4.  Halo's Delay

"[D]elay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement."  Apple, 678 F.3d at 1325; Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988) ("The period of delay exercised by a party prior to seeking a preliminary injunction in a case involving intellectual property is but one factor to be considered by a district court in its analysis of irreparable harm.").  However, there is no per se rule that failure to seek a preliminary injunction or to file suit soon after learning of the infringement precludes a finding of irreparable harm.  Apple, 678 F.3d at 1325-26; Mytee Prods., Inc. v. Harris Research, Inc., 439 F. App'x 882, 888 (Fed. Cir. 2011).

Here, Halo's delay in filing suit, its agreement to stay the litigation pending the patent re-examination, and its failure to move to lift the stay do not negate Halo's showing of irreparable harm.  First, as explained in this Court's Findings of Fact and Conclusions of Law, Halo's delay in bringing suit was not for the purpose of accruing damages, but rather due to circumstances largely out of the control of Halo and its officers.  (Order (Doc. #522) at 22-23.)  Further, Halo's agreement to stay the case was a reasonable litigation strategy to support Halo's contentions that its patents were valid and Pulse was infringing.  The Court

ordered the stay lifted in the case because given that the reexamination of the Halo patents could have taken several more years, no good cause remained to continue staying the proceedings.  (Order (Doc. #79).)  Thus, Halo's failure to move to lift the stay also does not show a lack of irreparable harm because the re-examination was still pending when the Court lifted the stay.

Halo's failure to seek a preliminary injunction, however, provides some support for Pulse's position that Halo is not irreparably harmed by Pulse's infringement.  The patentee seeking a preliminary injunction is not a prerequisite to a finding of irreparable harm. Mytee Prods., 439 F. App'x at 888 ("While we have held that delay in seeking an injunction is a factor to be considered in determining whether to issue a preliminary injunction, we have never held that failure to seek a preliminary injunction must be considered as a factor weighing against a court's issuance of a permanent injunction.").  Nevertheless, Halo's failure to file for a preliminary injunction gives some indication that Halo is not irreparably harmed by Pulse's infringement.

However, Halo's failure to file for a preliminary injunction is not enough to tip the balance of the evidence in favor of Pulse.  Halo has made a showing that it has suffered lost sales and a loss of customer goodwill, and that there is a nexus between its harm and Pulse's infringing product sales.  Although Pulse has presented evidence that undermines Halo's evidence on price erosion, Halo has shown it was irreparably harmed in other ways, and will continue to be irreparably harmed in the absence of an injunction.  Additionally, Halo licensing its patented design to other competitors does not show that Pulse's infringement does not cause Halo irreparable harm because Pulse is a different type of competitor.  Thus, considering all of the evidence, the irreparable harm factor weighs in favor of granting an injunction.

///

///

## B.  Inadequacy of Damages

Halo argues that damages are inadequate to compensate it for Pulse's infringement for essentially the same reasons that Halo is irreparably harmed.  Halo asserts that the damages resulting from its lost sales and lost customer goodwill are difficult to quantify and calculate.  Halo further argues that Pulse's poor financial condition also shows a damages award would be inadequate to compensate Halo because it is unlikely Pulse will be able to pay future royalty fees.

Pulse responds that money damages are adequate to compensate Halo for Pulse's future infringement because Halo's licensing program demonstrates Halo can place a price on future infringement.  Pulse further argues that it is in stable financial condition and would be able to pay a royalty fee for future infringement.

To determine whether damages would be inadequate to compensate the patentee, courts "consider the extent to which a forward-looking monetary award is a viable or meaningful alternative to an injunction."  Robert Bosch, 659 F.3d at 1156.  This includes considering the evidence submitted to prove irreparable harm, as "the issues of irreparable harm and adequacy of remedies at law are inextricably intertwined."  ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1337 (Fed. Cir. 2012); Robert Bosch, 659 F.3d at 1155 (finding money damages inadequate when patentee had demonstrated irreparable harm from lost market share, lost business opportunities, and price erosion because there was "no reason to believe that [the infringer] will stop infringing, or that the irreparable harms resulting from its infringement will otherwise cease, absent an injunction"); Douglas, 2013 WL 2158423 at *6 ("This court finds remedies at law inadequate to compensate [the patentee] for at least the reputation loss [the patentee] has suffered from the [infringer's] infringement.").

"Difficulty in estimating monetary damages is evidence that remedies at law are inadequate."  i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010).

However, if the harm to a patentee that will be caused by future infringement is readily quantifiable, then the payment of a royalty fee for that damage may be adequate compensation.  See ActiveVideo, 694 F.3d at 1337-38 (finding damages adequate because the patentee and infringer were not direct competitors, the patentee licensed its service to a third party that competed with the infringer, and the harm the patentee suffered was quantifiable and adequately compensable by a monthly royalty fee for each customer that signed up with the infringer rather than the patentee's licensee).

Finally, "the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement."  Acumed, 551 F.3d at 1328; see also ActiveVideo, 694 F.3d at 1340 (finding "extensive licensing, licensing efforts, solicitation of the [infringer] over a long period of time preceding and during litigation, and no direct competition between [the infringer and the patentee]" showed that money damages could adequately compensate the patentee for the infringement).  However, that the patentee licenses its patents to others does not always demonstrate that damages are adequate to compensate for future irreparable harm.  See Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 702-03 (Fed. Cir. 2008) (finding patentee's license to another competitor did not show damages were adequate because the nature of the market for the patented product was "design win," meaning the exclusion of a certain competitor would have a competitive effect even if the patentee did not have a product immediately available for sale).

An infringer's "questionable financial condition" also can show damages would be an inadequate remedy.  Robert Bosch, 659 F.3d at 1155 ("A district court should assess whether a damage remedy is a meaningful one in light of the financial condition of the infringer before the alternative of money damages can be deemed adequate.").  Evidence

which may show an infringer's inability to satisfy a judgment includes reports indicating the infringer is at risk of severe financial stress, such as bankruptcy.  Id. at 1154.

Here, damages would be inadequate to compensate Halo for Pulse's infringement for many of the same reasons that Halo is irreparably harmed by the infringement.  Halo has lost sales to Pulse and Pulse's infringement has caused Halo to lose customer goodwill. Although ordering Pulse to pay a royalty fee for each sale of an infringing product, at least in the United States, might compensate Halo for lost sales, the loss of customer goodwill cannot be compensated by a reasonable royalty payment, thus weighing in favor of an injunction.  Additionally, Halo is a small company, the patented technology is incorporated into nearly all of its surface mount transformers, and the technology allows Halo to distinguish itself over large competitors.  (Jury Trial Tr. - Day 2 (Doc. #435) at 13, 82, 108-09; Pl.'s Trial Exs. 97 & 100.)  This further shows Halo has suffered harm that is difficult to quantify.  See i4i Ltd., 598 F.3d at 862 (affirming a finding that damages were inadequate in a situation where a "small company was practicing its patent, only to suffer a loss of market share, brand recognition, and customer goodwill as the result of the defendant's infringing acts").

That Halo has licensed its patented technology to other competitors, and offered to license the technology to Pulse, does not mean monetary damages would be adequate to compensate Halo for Pulse's continued infringement.  Halo's licenses contain non-monetary terms, which this Court could not impose upon Pulse in the absence of an injunction.  (Pl.'s Trial Exs. 124 § 8.1, 134 § 8.2, 160 § 8.2, 161 § 4.1.)   Furthermore, Halo has shown Pulse is one of Halo's largest competitors and thus Pulse poses a greater threat for which a royalty fee might not fully compensate Halo for Pulse's infringement.

As to Pulse's financial condition, Halo has presented evidence that Pulse is not doing well financially.  (Countryman Decl., Exs. E-J.)  However, in a declaration in support of Pulse's opposition to Halo's permanent injunction request, Pulse's representative stated that

14

following the jury verdict, Pulse began accruing reserves to pay the damages awarded, anticipated future royalties, and any applicable interest.  (Munson Decl. ¶ 7.)  Pulse also has entered into a large recapitalization agreement with a third party to aid Pulse's recovery from its recent financial hardships.  (Countryman Decl., Exs. H & I.)  Pulse's preparation to pay damages, combined with its recapitalization agreement, shows that Pulse could be able to cover the damages awarded thus far and any future royalty.  Thus, Pulse's financial condition does not weigh in favor of finding damages inadequate to compensate Halo.

However, Halo has shown that it has suffered irreparable harm that is difficult to quantify, particularly its loss in customer goodwill.  There is no reason to believe that Pulse will cease its infringing activity, and thus Halo's irreparable harm will not abate without an injunction.  Therefore, the inadequacy of damages weighs in favor of granting an injunction.

### C.  Balance of the Hardships

Halo argues that the irreparable harm it would face without an injunction shows it would face significant hardship as well.  Halo asserts that Pulse, on the other hand, would suffer no hardship that can tip the balance in Pulse's favor because any hardship Pulse suffers is due to Pulse's unlawful activities.  Halo also argues that Pulse's trial assertions that it could switch to a different, non-infringing design, shows that Pulse actually would not be harmed by an injunction.

Pulse responds that Halo has not shown that allowing Pulse to continue infringing while paying a royalty fee to Halo would create a hardship for Halo.  Pulse also argues that enjoining Pulse's sales of its accused products would be extraordinarily disruptive and burdensome to Pulse because Pulse likely would be unable to honor its existing contracts.  Pulse further contends that if an injunction were granted it would be required to modify its manufacturing process at great cost, which would waste resources because Halo's patents expire in just two years.

The balance of the hardships assesses the relative effect on the parties of granting or denying an injunction.  i4i, 598 F.3d at 862; Acumed, 551 F.3d at 1330 (stating that "the balance considered is only between a plaintiff and a defendant").  A patentee being forced to compete against its own patented invention can be a substantial hardship which outweighs the burden placed on an infringer resulting from an injunction.  Robert Bosch, 659 F.3d at 1156.  Furthermore, "a party cannot escape an injunction simply because . . . its primary product is an infringing one."  Id.  While balancing the hardships, a district court does not abuse its discretion by disregarding an infringer's expenses in designing, marketing, or redesigning its infringing products.  i4i, 598 F.3d at 863; Acumed, 551 F.3d at 1330.

Here, Halo directly competes with Pulse, which results in lost sales and lost customer goodwill.  Thus, Halo's hardships associated with Pulse's infringement weigh in favor of granting an injunction.  See Robert Bosch, 659 F.3d at 1156 (finding the balance of the hardships weighed in favor of granting an injunction when the patentee would be required to compete against its own patented invention in the absence of an injunction).

Pulse argues that it would be unable to fulfill certain contractual obligations to provide open header surface mount transformers if the Court grants Halo permanent injunctive relief.  (Munson Decl. ¶ 9.)  Pulse further asserts that forcing Pulse to cease selling its infringing products would be costly and disruptive to Pulse's business. (Id. ¶¶ 10 & 11.)  However, costs and disruption to Pulse's business due to switching to a non-infringing design do not sway the balance of the hardships in Pulse's favor.  See i4i, 598 F.3d at 863 (finding the cost of redesigning the infringing products "irrelevant" and the infringer "is not entitled to continue infringing simply because it successfully exploited its infringement"); Acumed, 551 F.3d at 1330 ("We also see no abuse of discretion in the court's decision not to consider Stryker's expenses in designing and marketing the T2 PHN, since those expenses related to an infringing product.").  Furthermore, Pulse's representative testified at

16

trial that it could switch to a different, non-infringing design to meet its customers' needs. (Jury Trial Tr. - Day 6 (Doc. #465) at 41-42.)  Thus, Pulse's costs associated with changing to a non-infringing design and any disruption to its business if it were required to stop making infringing sales does not tip this factor in Pulse's favor.

That the injunction would last only until August 2015, at which time the Halo patents expire, also does not tip the balance in Pulse's favor.  See Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1234 (Fed. Cir. 1985) ("The fact that the patent has only one year to run is not a factor in favor of [the infringer] in the balance of equities.  Patent rights do not peter out as the end of the patent term, usually 17 years, is approached.").  Thus, Halo's hardships resulting from Pulse's continued infringement outweigh Pulse's hardships if it were forced to stop infringing.

However, Pulse has a cognizable interest in making non-infringing sales outside of the United States.  These non-infringing sales should not be hindered by injunctive relief.  But, any hardship on Pulse's non-infringing sales can be avoided by narrowly tailoring the scope of the injunction so that it does not inhibit Pulse's non-infringing sales.  Consequently, limiting the scope of the injunction can alleviate Pulse's potential hardship, but an injunction is the proper remedy to address Halo's hardships.

**D.  Public Interest**

Halo argues an injunction would not disserve the public interest because an injunction would favor the strong public interest of enforcing patent rights, and there is no public safety risk associated with granting an injunction.  Halo further argues that third parties will not suffer any harm if Pulse were enjoined, because Halo and its licensees provide alternative sources for surface-mount transformers.

Pulse responds that the public interest would not be served by an injunction because Halo has not shown that Halo and its licensees could fulfill the demand which would be created by enjoining Pulse from selling its infringing products.  Thus, Pulse concludes that

an injunction would adversely affect Pulse's customers, its customers' customers, and consumers of electronic products.

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i, 598 F.3d at 863; see also ActiveVideo, 694 F.3d at 1341 ("The proper question on the public interest should be: will an injunction harm a specific public interest that outweighs the public's interest in a robust patent system?" (quotation omitted)). Relevant to this analysis is whether the public still may obtain the patented products from another source if the infringer is enjoined. Celsis In Vitro, 664 F.3d at 932.

Here, although Halo has presented evidence that Halo and its licensees sell the patented design to some of the same customers as Pulse, Halo has not presented specific evidence showing that if injunctive relief were granted Halo or its licensees could fulfill the demand created by Pulse's absence. The evidence indicates that Pulse is one of Halo's largest competitors, while Halo is a relatively small player in the surface-mount transformer market and would potentially acquire around 1.3 percent of Pulse's sales if Pulse were taken out of the market. (Jury Trial Tr. - Day 5 (Doc. #464) at 100, 133-37; Jury Trial Tr. - Day 9 (Doc. #468) at 44-45.) Furthermore, Pulse's representative stated that the public interest would be disserved by an injunction because Pulse customers would be forced to switch to different Pulse products, which would require the customers to spend time and money approving the new products. (Munson Decl. ¶ 12.) Pulse's representative concludes this ultimately would be disruptive to the public who purchase consumer electronics. (Id.) Thus, there is evidence that customers of Halo's patented surface-mount transformer design, as well as the public, may be disserved by an injunction.

However, that Halo and its licensees sell Halo's patented design, combined with Pulse's stated ability to meet customer needs with other non-infringing designs, minimize

the risk of a supply shortage of surface-mount transformers with Halo's patented design. And, overall, the weight of the evidence is in favor of Halo receiving a permanent injunction to enjoin Pulse's infringement.  The Court therefore finds Halo is entitled to injunctive relief to prohibit Pulse's infringement.

**E.  Scope of Injunction**

Halo submits that, in addition to the standard provisions prohibiting direct and induced infringement, the injunction should include specific provisions that prevent further induced infringement.  First, Halo argues Pulse should be required to send a letter to Pulse's customers and its customers' customers stating the infringing products cannot be used, sold, offered for sale, or imported into the United States.  Second, Halo argues that Pulse should be required to add a disclaimer to all communications about the infringing products stating that the infringing products cannot be used, sold, offered for sale, or imported into the United States.  Third, Halo argues Pulse should be required to stop obtaining a United States specific certification for the infringing products.  Finally, Halo argues Pulse should be required to include a copy of the injunction in all shipments of infringing products outside the United States, as well as a notice indicating the part shipped is affected by the injunction.

Pulse argues that Halo's proposed injunctive relief is overbroad.  Specifically, Pulse argues that the verdict shows the jury rejected Halo's estimates of how many of Pulse's infringing products sold outside of the United States ultimately were shipped back into the United States.  Pulse thus argues that Halo has failed to prove that Pulse's foreign sales are infringing, and therefore Halo should not be granted injunctive relief with provisions regarding Pulse's foreign sales.

In a patent infringement matter, "the only acts [an] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices." <u>Int'l Rectifier Corp. v. IXYS Corp.</u>,

383 F.3d 1312, at 1316 (Fed. Cir. 2004).  Furthermore, "a trial court, upon a finding of infringement, must narrowly tailor an injunction to fit the specific adjudged violations." Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1311 (Fed. Cir. 2002).  "Thus, an injunction cannot impose unnecessary restraints on lawful activity."  Id. at 1311.

Here, the jury found that Pulse directly infringed and induced others to infringe the asserted patent claims.  (Jury Verdict (Doc. #482).)  Halo's theory for induced infringement was that Pulse sold its infringing parts to foreign customers, and the parts were then incorporated into final products that eventually were sold into the United States.  Thus, at least some portion of Pulse's foreign sales are infringing because the jury found induced infringement.  Therefore, prohibitions on Pulse's sales of the infringing products in the United States, as well as specific provisions to address future induced infringement resulting from Pulse's foreign sales, are proper.

Specifically, Halo's request that Pulse be prohibited from seeking United States specific certification of its infringing parts and that Pulse be required to send a copy of the injunction with each foreign shipment of infringing parts are reasonably tailored to prevent further induced infringement.  First, Halo presented evidence that when a product is going to be sold in the United States, it needs to be "UL recognized or certified."  (Jury Trial Tr. - Day 2 (Doc. #435) at 251-56.)  Pulse's designated witness under Federal Rule of Procedure 30(b)(6) recognized the UL certification was United States specific and meant that Pulse's part was "eligible to be used in a system that has the possibility of being shipped in the United States."  (Jury Trial Tr. - Day 5 (Doc. #464) at 41-42.)  Prohibiting Pulse from seeking United States specific UL certification of its infringing parts would further ensure that the infringing parts Pulse sells overseas are not imported back into the United States.  Second, Halo's request for a provision requiring that Pulse include a copy of the injunction in every delivery of infringing parts made outside of the United States is narrowly tailored to prevent further induced infringement in a minimally invasive and burdensome manner.

However, the Court denies Halo's other requested relief specific to induced infringement.  The Court denies Halo's request that Pulse be required to send a letter to Pulse's customers, as a copy of the injunction sent with every future foreign shipment of Pulse's infringing products is adequate to give Pulse's customers notice of the injunction and prevent further induced infringement.  Furthermore, the Court denies Halo's request that Pulse be required to send Pulse's customers' customers a letter notifying them of the injunction because Halo has not shown this would not place too great a burden on Pulse to determine the identity of Pulse's customers' customers.  The Court also denies Halo's request that Pulse be required to add a disclaimer to all communications about the infringing products because it is overly burdensome.  The copy of the injunction included in any actual foreign shipments of the infringing products is sufficient to provide customers notice of the injunction.  Finally, the Court denies Halo's request that the copy of the injunction sent with every foreign shipment of the infringing products be accompanied by a notice indicating the part shipped is affected by the injunction is redundant, as the copy of the injunction provides adequate notice.

## II.  CONCLUSION

**IT IS ORDERED** that Plaintiff Halo Electronics, Inc.'s Motion for a Permanent Injunction (Doc. #505) is hereby **GRANTED**.


DATED:  June 17, 2013

_____
PHILIP M. PRO
United States District Judge